BREAUX, C. J.
Benedetto Morasca was the owner of a grocery store in ttje city of New Orleans.
He sued the defendant for $5,000 damages.
Plaintiff charges the “New Orleans Item,” a daily, with having published a false and libelous report, which reflects upon him and his business, which has occasioned damages in tfie sum before stated.
The police authorities were investigating a case of reported poisoning of three persons.
The newspaper stated at the time, in one of its columns, under the heading, in capital letters, that it was believed that the negroes had been poisoned from sugar contained in tea, for which they were under medical treatment.
Their names were given in the printed report, which stated that the sugar was bought from a “grocery store at Sixth and Rampart.”
The negro child died.
The day following that publication just mentioned, the defendant published on the fourth page that the “Poison Was Being Investigated” (heading of the report), and the article stated that the coroner thought that the child died from tartar emetic poisoning; that the chemist had the examination of the stomach, kidneys, and liver in charge; and that he also had samples of the sugar and tea procured from the grocery store of Bene-detto Morasca, where the occupants of the house who were poisoned made their purchase which was believed to have caused the child’s death.
The article read:
“It is the opinion of Coroner O’Hara that the child died, from tartar emetic poisoning. He thinks that some of this substance, which is used in the composition of ant poison, may have accidentally gotten in the sugar at the grocery.”
The first complaint of plaintiff is that his name was stated — his grocery — and that in connection with the statement that the persons named were further referred to as “the poison patients,” poisoned by sugar bought from his grocery; and the second complaint of plaintiff is that it was given as the opinion of the coroner that the sugar sold in plaintiff’s store contained poison.
*429 The articles were pleaded in the words of the publication.
The defendant admitted the publication, denied malice, pleaded privilege, and alleged the articles were printed as ordinary news taken from the public records and were given no more prominence or space than is usually given to similar articles.
The defendant offered the report of the police sergeant commanding the Sixth precinct police — a report made in accordance with the rule of the police department, and filed with the inspector.
In the report, the sergeant stated that he had instructed the patrolmen to investigate the suspicious cases of poison, and that he found a colored woman “naméd Sylvester Heins, aged 70 years, John B. Powell, Jr., aged 2 years and 7 months, and Nathaniel Burns, aged 16, all colored, residing in the ■same house apparently sick and claiming that they were attended by Dr. Debofie and Dr. Dejóle, who stated that the sickness was caused by the sugar put in the tea Saturday evening. The officer procured a sample of the sugar from the grocery of Benedetto Morasca, * * * where the sugar was bought by the sick family.”
One of the doctors afterward informed the policemen that the patients had taken something that caused irritation of the stomach causing them to throw up; that he had administered medicine; and that they were all doing well.
The coroner the same day went to the house, made an investigation, and said that he could find no trace of poisoning; they were doing well; in his opinion they were ailing from a disease prevalent in the city at the time.
At the autopsy, held by the coroner and jury over the body of the dead child, they arrived at the conclusion that death was due to antimony et potassi tartaris.
The Item published, three days after the casualty, that Benedetto Morasca denied that sugar purchased at his store can in any way 'be responsible for the death of the two year old negro, and that paper stated that it was the opinion of Dr. O’Hara that the child died from.tartar emetic poisoning, that proper examination by the city chemist was under way, and samples were taken from plaintiff’s grocery to see whether any poison used for roaches, ants, or other vermin had by accident gotten into the grocery.
That plaintiff said:
“The only sample taken from our store was some sugar. I have here the signed names of persons who bought sugar from the same barrel and were not hurt by it.
“In fact, we never used any poisons about the store to kill vermin, and it is not possible that any of our groceries could contain injurious matters of any kind. To prevent ants from getting into the sugar barrel, we used nothing but a rag soaked in coal oil tied on the outside at the bottom of the barrel.”
That the report did them an Injustice and subjected them to loss.
Morasca, the plaintiff, is the owner of the grocery that is conducted by his daughter. He has very little to do with it, as he is a musician, and his time is taken up in teaching music.
. As a witness, he sought to prove the extent of his loss by the failure of those who had bought to continue in buying from him.
Pressed to answer as to the extent of his loss, he was not at all exact in his answers, nor did he succeed in proving the extent of his loss.
• Discussion and judgment:
The result shows that the report that there was poison in plaintiff’s barrel of sugar was entirely untrue. It originated among the negroes who had bought sugar from the grocery. They insisted — particularly the mother of the dead child — that the sugar she bought from the grocery was the cause of death. To such an extent this report spread that the police authorities very properly undertook to investigate and see for themselves if there was any truth in the report.
*431 It was during that time, and while proper report was forwarded to the central office, that the police reporter of the newspaper wrote the two articles — one on one day and the other on the next day — of which plaintiff earnestly complains.
As to malice, it is not charged eo nomine, although the charge may be inferred from the fact that plaintiff charged it was “false,” “misleading,” “libelous,” and “defamatory in the highest degree and calculated to injure plaintiff.”
All of which, to an extent, is true; but we have not found that there was express malice on the part of defendant as a fact. The publication does not appear in the light of a publication made with actual knowledge of the charge as false. We can only say that it is not sufficient to show actual malice.
“Legal malice” is defined as an act growing out of the “wicked or mischievous intention of the mind; an act' showing a wanton inclination to mischief, an intention to injure or wrong, and a depraved inclination to disregard the rights of others.”
We are unable to say that such was the intention of the defendant, for in our opinion it was not. The most that can be said is that there was indifference.
There was no negligence imputed to the plaintiff nor the least wrong charged. There was no intimation that one person had attempted to poison others.
In the second publication, which followed the first in date, it was stated that the coroner thought that the child died from tartar emetic poisoning. “He” (the paper stated) “thinks that some of this substance, which is used in the composition of ant poison, may have accidentally gotten into the sugar at the grocery.”
Taking the whole statement, nothing was said that may not occur in nearly .all groceries without its being possible to attach the least blame to any one.
The child died of poison; to that point the facts were correctly stated. It was not bought from plaintiff.
I-Ie was not defamed, for his name was not connected with any wrongful act; besides, he was not in charge of the grocery.
There was reason for inquiry and probable cause for some concern. It became proper for the police department to act as it did.
The defendant, through its police reporter, took up the report and made it known, not by large and sensational headlines, as stated by plaintiff. It mentioned that there was an investigation on foot. It sought to set forth the facts. There does not appear to have been ill will or malice on its part.
There was extravagant talk among the ne-groes, many of whom bought groceries at plaintiff’s store. The mother of the dead child talked excessively, and altogether there were rumors that pi’ompted an investigation.
It does not seem that it went too far under the circumstances. Reference by the newspaper to the steps taken was not actionable.
Whenever poison is mentioned as having been taken, it always attracts attention among all persons. It will be talked of and even published. If done, as in this case, to report the facts, there is no ground of action for punitory damages at any rate. In other words, the fact invites attention and excites comment, which, if fairly published or made in good faith, is not libel or slander.
Furthermore, questions relating to life, health, and welfare may be commented upon, and, if erroneous deductions be made, it does not give cause for damages unless special damage can be shown; that is, when persons taking part in the inquiry are not prompted by malice. Newell (2d Ed.) p. 591.
As to an arrest, the following has the sanction of a well-considered opinion:
While comments should not be made, the arrest of a person and the charge against him may be published. Tresca v. Maddox, 11 La. Ann. 206, 66 Am. Dec. 198.
*433 The defendant did not go further than sanctioned by the foregoing.
The case of Billet v. Times Democrat Publishing Co., 107 La. 751, 32 South. 17, 58 L. R. A. 62, is not pertinent, as the publication in the case before us for decision — different from the cited case — did not assume that the plaintiff was guilty of the lesser offense or impropriety.
Besides, the defendant in the cited ease undertook to justify by proving the truth of the fact stated.
In the present case there was no refusal to retract; on the contrary, without request, the defendant within four or five days after the first publication published an explanatory account relieving the plaintiff of blame.
The plaintiff, in support of his claim, confidently cites Cass v. New Orleans Times, 27 La. Ann. 215.
The facts of the cited case are different; the charge constituting libel was untrue and defamatory. The affidavit made the basis of the report published -by the Times was false and malicious. There was a direct attempt made to humiliate and degrade the plaintiff.
Here, there is nothing of the kind.
The question of privilege vel non does not arise in the case at hand, as there was no libel committed at any time nor by any one.
In the other decisions cited, a libel had been published without the least necessity or the most remote justification.
There is unquestionably no ground upon which to allow punitive damages. A claim for punitive damages finds no support in any of the authorities we have read.
There is better ground, of course, upon which to claim actual damages.
But as to these, the attempt of plaintiff to prove that he had suffered losses in his business has failed. The allegation in this respect is not sustained; the nature or the extent of the loss are not sufficiently evident to have a judgment thereon for damages. The testimony fixes no amount of loss.
For reasons stated, the judgment is affirmed.
MONROE, X, dissents.
PROVOSTX, X, takes no part, not having heard the argument.